**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANK ROBERT CHESTER, <u>et al.</u>,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil No. 1:08-cv-1261** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **JOHN E. WETZEL, <u>et al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Before the Court is a motion for stay of execution, temporary restraining order, or

preliminary injunction filed by Plaintiff Hubert Michael, who is an inmate under sentence of

death.  (Doc. No. 139.)  Mr. Michael is scheduled to be executed by lethal injection on Thursday,

November 8, 2012.  For the reasons that follow, the Court will deny the motion.

**I.      PROCEDURAL BACKGROUND**

The above-captioned action is a class action lawsuit filed pursuant to 42 U.S.C. § 1983,

challenging the constitutionality of Pennsylvania's lethal injection protocol.  The original

complaint in this case, filed in 2007, contained only one constitutional challenge: that the

protocol poses an unnecessary risk that Plaintiffs will suffer pain in violation of the proscription

against cruel and unusual punishment and the guarantees of due process of law under the Eighth

and Fourteenth Amendments of the United States Constitution.  (Doc. No. 1 ¶ 40.)  Counsel has

been appointed to represent the class, which consists of all persons who are presently under a

sentence of death in Pennsylvania or who at some point during the pendency of this action will

be under a sentence of death by lethal injection in Pennsylvania.  Separate counsel has entered an

appearance on behalf of unnamed Plaintiff class member Hubert Michael, who has also moved to

intervene in this action.

After some discovery had been conducted in this action, on October 7, 2010, Defendants informed the Court that the Pennsylvania Department of Corrections (DOC) was developing a new lethal injection protocol that it expected to issue within three to four weeks.  (Doc. No. 67.) Thus, at Defendants' request and with the agreement of Plaintiffs, the Court stayed all deadlines in this case pending DOC's adoption of a new protocol.  (Doc. No. 68.)  On January 20, 2011, after having informed the Court that DOC had provided counsel for Plaintiffs with a new lethal injection protocol, Defendants again advised the Court that DOC was developing yet another protocol, and moved the Court to extend the discovery deadlines in the case.  (Doc. Nos. 72, 73.) The Court granted the motion and ordered that additional discovery was to be completed within 90 days of Plaintiffs' counsel receiving a copy of the new policy.  (Doc. No. 73.)

On August 28, 2012, DOC informed Plaintiffs that it had revised its execution protocol the previous day.  (Doc. No. 81.)  On September 5, 2012, Defendants' counsel disclosed the new execution protocol to class counsel.  (Doc. No. 85.)

On September 11, 2012, Pennsylvania Governor Tom Corbett signed a warrant setting Plaintiff Hubert Michael's execution for November 8, 2012.  (Doc. No. 131 ¶ 9.)  Plaintiff Michael entered an appearance in this action on October 10, 2012.  (Doc. No. 118.)  On October 16, 2012, Plaintiff Michael filed an intervenor complaint jointly with another Plaintiff, Terrance Williams.  (Doc. No. 131.)  In their joint intervenor complaint, Plaintiffs Michael and Williams bring four constitutional challenges to Pennsylvania's lethal injection protocol, three of which were not contained in the original complaint.  On October 23, 2012, Plaintiff Michael filed a motion for stay of execution, temporary restraining order, or preliminary injunction.  (Doc. No. 139.)

In his motion for stay of execution, Plaintiff Michael argues that the Court should enjoin Defendants from using their procedures to execute him until his claims can be reviewed and resolved on the merits. (Id.) Specifically, Plaintiff Michael argues that: (1) Defendants' execution procedures, practices and policies create a risk that he will suffer pain in violation of the Eighth and Fourteenth Amendments (Claim I); (2) Defendants' written execution procedures are unlawful and invalid under state law (Claim II); (3) the written protocol violates Mr. Michael's rights to due process under the Fifth and Fourteenth Amendments (Claim III); and (4) the execution procedures' failure to provide for counsel's presence at the execution violates Mr. Michael's constitutional rights to access to counsel and the courts under the First, Sixth, Eighth, and Fourteenth Amendments (Claim IV). (Id.) On October 31, 2012, Defendants filed a brief in opposition to Plaintiff Michael's motion. (Doc. No. 161.) On November 5, 2012, the Court held an evidentiary hearing and oral argument related to the motion for a stay of execution.

## II. LETHAL INJECTION PROTOCOL

The DOC revised its lethal injection protocol on August 27, 2012, effective August 28, 2012. The lethal injection protocol consists of a document entitled 6.5.8, Capital Case Procedures Manual, Section 4 – Execution Procedures. (Hrg. Nov. 5, 2012, Pl. Exh. 14.) The version that Defendants submitted to the Court has been substantially redacted.

According to the protocol, executions take place at SCI-Rockview in Bellefonte, Pennsylvania. The Secretary of the DOC designates the time of the lethal injection on the date stated on the execution warrant signed by the Governor. The DOC designates a lethal injection team (LIT) consisting of "a sufficient number of individuals qualified to administer the lethal injection to ensure that a two-member team, at a minimum, will be available for each scheduled

execution." (Id. at 8.)  The LIT members "must be trained health care professionals who have completed intravenous therapy training and are experienced in performing venipuncture.  In the case of a collapsed vein(s), team members must be able to identify appropriate alternative IV access points.  At least one team member will have experience in placing an IV in the jugular vein." (Id. at 9.)  The lethal injection protocol does not detail the training required of the LIT members.

On the date of the execution, the LIT members will ensure that all necessary inventory is in proper order.  (Id. at 23.)  A number of details are set forth in the protocol, ranging from the temperature of the drugs and the colors of the syringes to the outfits that the LIT members wear during the execution.

Once the inmate is transported to the lethal injection chamber and secured on the injection table, the LIT members enter the injection chamber, and connect an electroencephalograph (EEG) monitor to monitor the inmate's consciousness level and an electrocardiograph (ECG) to monitor the inmate's heart, if those monitors are being used.  (Id. at 29.)  Next, members of the LIT will establish two IV catheters, one in each forearm or other usable vein.  The catheters are connected to an IV extension set that leads to a saline solution infusion.  The LIT members will then start and regulate the flow of saline at a rate sufficient to keep the vein open.  (Id.)

After the Secretary of the DOC or the Secretary's designee determines that no stay of execution has been ordered, the Capital Facility Manager or designee will give the final order for the execution to proceed, and the LIT will begin administering a three-drug protocol.  (Id. at 30.)  The first drug is an anesthetic, either pentobarbital or sodium thiopental.  The DOC has

expressed that it intends to use pentobarbital with respect to Michael's execution. First, one syringe containing 2,500 mg of pentobarbital will be inserted into an IV administration set connected to the left arm, and the syringe is to be injected into the tube. Next, a second syringe containing 2,500 mg of pentobarbital is to be injected into an IV administration set connected to the right, and injected. Thereafter, 50 ml of saline is to be administered to the left IV administration set to flush the line. A checklist attached to the protocol indicates that a saline flush will also be performed on the right arm IV line. (Id. at 51.)

After injecting the first drug and the saline solution, the LIT will ensure that the inmate is unconscious. If an EEG monitor is being used, the LIT will observe the EEG monitor to determine if the patient state index (PSI) is nine or less. (Id. at 31.) Next, a consciousness check is performed,[1] whereby the Capital Facility Manager or designee will call the inmate's name in a loud voice and observe the inmate for a reaction, a member of the LIT will assess the inmate by touching the inmate, shaking the inmate's shoulder, and brushing the inmate's eyelashes. The Capital Facility Manager or designee and the LIT will closely monitor the inmate and must agree that the inmate is unconscious. (Id.) If either the LIT or the Capital Facility Manager or designee believes that the inmate is not unconscious, the LIT will administer more anesthesia as described above.

The LIT will then inject one dose of 50 mg of pancuronium bromide through the injection tube connected to the left arm, and will flush the injection tube with 50 ml of saline solution. (Id. at 32.) Next, the LIT will proceed with injecting the inmate with the third drug:

---

[1] A consciousness check will be performed two minutes after administration of the first drug in the event that an EEG is not used. (Id.)

two sequential doses of 50 meq of potassium chloride in the tube connected to the left arm. (Id.) Potassium chloride is an electrolyte used to stop the inmate's heart. After the potassium chloride is administered, the LIT will observe the ECG monitor to ensure that cardiac electrical activity has ceased for two minutes. If the inmate does not die after two doses of the potassium chloride are administered, a third and fourth dose will be administered into the tube connected to the inmate's left arm. After the absence of cardiac electrical activity is observed for two minutes, or after three minutes have passed if an ECG is not being used, the Coroner will enter the injection chamber to pronounce the inmate dead.

Execution procedures are rehearsed at least three times per year, and additional rehearsals are held whenever there is an imminent execution. (See Doc. No. 161 at 10; Hrg. Nov. 5, 2012, Pl. Exh. 1 at 5.)

## III. STANDARD OF REVIEW

A district court may order a stay of execution in certain circumstances where a state's execution would not comport with the Constitution. See Nelson v. Campbell, 541 U.S. 647, 650 (2004); Hill v. McDonough, 547 U.S. 573, 583-85 (2006); Baze v. Rees, 553 U.S. 35, 61 (2008). However, "[f]iling an action that can proceed under § 1983 does not entitle the complainant to an order staying an execution as a matter of course." Hill, 547 U.S. at 583-84. Instead, a stay of execution is an equitable remedy that requires consideration of the Commonwealth's "strong interest in enforcing its criminal judgments without undue interference from the federal courts." Id. at 384. The standard for granting a stay of execution is the same as the standard for granting a preliminary injunction. Id.; see also Towery v. Brewer, 672 F.3d 650, 657-58 (9th Cir. 2012) ("In the context of a capital case, the Supreme Court has emphasized that [the standards for

granting a preliminary injunction] apply when a condemned prisoner asks a federal court to enjoin his impending execution . . . .") (citing Hill, 547 U.S. at 584).

A motion for a preliminary injunction is governed by Rule 65(a) of the Federal Rules of Civil Procedure. An injunction is an "extraordinary remedy" that is never awarded as of right. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). "A party seeking a preliminary injunction must satisfy the traditional four-factor test: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief." Miller v. Mitchell, 598 F.3d 139, 147 (3d Cir. 2010) (citing Child Evangelism Fellowship of N.J. Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)).

## IV.    DISCUSSION

### A.    Likelihood of Success on the Merits

The burden is on Plaintiff Michael, as the moving party, to demonstrate a likelihood of success on the merits. Plaintiff Michael may satisfy this burden by demonstrating that there is a "reasonable likelihood that [he] will ultimately win the relief [he] seek[s]." N. Pa. Legal Servs., Inc. v. Lackawanna Cnty., 513 F. Supp. 678, 681 (M.D. Pa. 1981). Failure to demonstrate a likelihood of success on the merits necessarily results in the denial of a preliminary injunction. In re Arthur Treacher's Franchisee Litig., 689 F.2d 1137, 1143 (3d Cir. 1982).

Plaintiff Michael has set forth four claims in his motion for stay of execution, including three claims that were not raised in the original complaint in this action. For the reasons that follow, the Court finds that he has not established a likelihood of success on the merits of any of these claims.

7

### 1. Claim I: Cruel and Unusual Punishment

First, Plaintiff Michael argues that Defendants' written execution procedures violate his right to freedom from cruel and unusual punishment under the Eighth and Fourteenth Amendments. (Doc. No. 141 at 8.) The Eighth Amendment to the United States Constitution, which is applicable to the States through the Due Process Clause of the Fourteenth Amendment, provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII; Baze v. Rees, 553 U.S. 35, 47 (2008). In Baze, considering the constitutionality of Kentucky's three-drug lethal injection protocol, the United States Supreme Court began with the premise that capital punishment is constitutional, and reasoned that "[i]t necessarily follows that there must be a means of carrying it out. Some risk of pain is inherent in any method of execution – no matter how humane – if only from the prospect of error following the required procedure." Id. A plurality of the Supreme Court held that in order to prevail on an Eighth Amendment claim challenging the constitutionality of an execution procedure, an inmate must show that there is "a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" Id. at 50 (quoting Farmer v. Brennan, 511 U.S. 825, 842, 846, and n.6 (1994)); Jackson v. Danberg (Jackson I), 594 F.3d 210, 222-23 (3d Cir. 2010) (adopting the Baze plurality as the narrowest grounds upon which five Justices agreed) (citing Marks v. United States, 430 U.S. 188, 193 (1977)).

> To prevail on a claim that the exposure to such risk runs afoul of the Constitution, an inmate must demonstrate that "the conditions presenting the risk must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'" Id. at 1530-31 (quoting Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L. Ed. 2d 22 (1993)). An inmate

> falls short of that burden by showing only that "an execution method
> may result in pain, either by accident or as an inescapable
> consequence of death[.]" <u>Id.</u> at 1531.

<u>Jackson I</u>, 594 F.3d at 216.

The Third Circuit, in <u>Jackson I</u>, held that Delaware's lethal injection protocol was

constitutional because it provided safeguards that exceeded those in the Kentucky protocol that

the Supreme Court in <u>Baze</u> "found constitutionally firm." <u>Id.</u> at 230. The three-drug protocol

used by Delaware at the time of the Third Circuit's decision in <u>Jackson I</u> called for the sequential

administration of sodium thiopental, pancuronium bromide, and potassium chloride. Months

later, the plaintiffs in that case challenged Delaware's revised procedures, which called for the

use of pentobarbital rather than sodium thiopental. The Third Circuit affirmed the district

court's denial of the plaintiffs' motion to stay, holding that the district court did not abuse its

discretion in finding that pentobarbital is an effective anesthetic for use in the three-drug

protocol. <u>Jackson v. Danberg (Jackson II)</u>, 656 F.3d 157, 166 (3d Cir. 2011).

Here, Plaintiff Michael argues that Defendants' lethal injection procedure creates a

substantial risk of serious harm by failing to ensure that a prisoner is adequately anesthetized

before the administration of the second and third drugs, noting several differences between

Pennsylvania's protocol and the constitutionally acceptable protocols utilized in Kentucky and

Delaware. Specifically, Plaintiff Michael avers that the procedures create a significant risk of

harm because: (1) the protocol requires the use of a two-arm administration of pentobarbital; (2)

the protocol requires use of drugs that are presently unavailable except from unreliable sources;

(3) the protocol contains inadequate safeguards against a last-minute stay of execution; (4) the

LIT members are not adequately trained or qualified to: (a) assess consciousness, (b) administer

general anesthesia, or (c) interpret EEG monitors; (5) the protocol places no time limits on the LIT's efforts to achieve venous access; and (6) the protocol commands significant deviations from the statute that authorizes lethal injection. The Court will consider whether any of these challenges implicate a constitutionally unacceptable risk that Mr. Michael will suffer serious pain and needless suffering.

<h4 align="center">a.  Two-Arm Administration of Pentobarbital</h4>

Mr. Michael contends that the protocol's "novel, untested administration technique for pentobarbital" in which half of the total dose of the drug is administered in the left arm and half of the total dose is administered in the right arm creates a serious risk that he will not be unconscious prior to the administration of the second and third drugs. (Doc. No. 141 at 9.) The execution protocol provides that "one syringe containing 2,500 mg pentobarbital . . . will be inserted in the 'Y' injection tube of the left arm administration set and the injection shall commence" and "a second syringe containing 2,500 mg pentobarbital . . . will be inserted into the 'Y' injection tube of the right arm IV administration set and the contents injected." (Doc. No. 108-4 at 13.) According to the protocol, "50 ml Normal Saline . . . will [then] be inserted into the 'Y' injection tube of the left arm IV administration set and the contents injected to flush the line." (Id.)

Mr. Michael avers that because this protocol does not require a saline flush of the injection tube of the right arm IV administration set, there is a substantial risk that the LIT will not notice any problems with this injection tube, potentially resulting in Mr. Michael receiving less than 5,000 mg of pentobarbital. In support of Plaintiff Michael's argument, Dr. David B. Waisel – who the Court accepted as an expert in anesthesiology – opined that the absence of a

saline flush on both arms increases the risks that the drug will not "fully reach the inmate," and that the barbiturate and muscle relaxant will mix and cause painful flocculation that can render the IV inoperable. (Hrg. Nov. 5, 2012, Pl. Exh. 32 at 10.) In reaching this opinion, Dr. Waisel appears to rely on an understanding that the protocol "does not require a flush of the right arm line after administration of the pentobarbital." (Id.) However, a document entitled Checklist of Lethal Injection Procedures, which is attached to the lethal injection protocol, provides for the performance of a 50 ml saline flush on both the left and right IV lines following administration of pentobarbital in each IV line. (Hrg. Nov. 5, 2012, Pl. Exh. 14 at 51.)

Mr. Michael has not made a clear showing that the two-arm administration of anesthesia creates a substantial risk of severe pain. First, contrary to Mr. Michael's contentions, the protocol's administration of pentobarbital is not a novel or untested administration technique. See Pavatt v. Jones, 627 F.3d 1336, 1339 (10th Cir. 2010) ("[T]he first step of the [Oklahoma Department of Corrections'] lethal injection protocol mandates the intravenous administration to the subject inmate of 5,000 milligrams of pentobarbital (2,500 milligrams in each arm)."). Second, Mr. Michael's contention that, because the protocol does not require a saline flush of the right arm IV administration set, the LIT may mistakenly cause him to not be sufficiently unconscious prior to the injections of the second and third drugs, is unavailing. First, the protocol does in fact call for a saline flush on both arms. However, even if it did not, this would not create an unconstitutional risk of pain in and of itself. The Supreme Court recognized in Baze that "[s]ome risk of pain is inherent in any method of execution – no matter how humane – if only from the prospect of error in following the required procedure" and, as a result, "the Constitution does not demand the avoidance of all risk of pain in carrying out executions." 553

11

U.S. at 47.

Moreover, it is not clear from the record whether the entire 5,000 mg dose of pentobarbital is necessary for an inmate to be sufficiently anesthetized or if some lesser amount would be sufficient. An expert in the Pavatt case, which involved Oklahoma's lethal injection protocol, characterized a 5,000 mg dose of pentobarbital as "an enormous overdose" that would be lethal. Pavatt, 627 F.3d at 1339. The record in this case is devoid of any expert testimony regarding the necessary dose of pentobarbital to achieve the required level of unconsciousness. Plaintiff Michael relies on nothing more than speculation to support his argument that the lethal injection protocol's use of a two-arm injection technique creates a serious risk of maladministration. Mr. Michael cannot successfully challenge the lethal injection protocol "merely by showing a slightly or marginally safer alternative." Baze, 553 U.S. at 50.

Thus, the Court finds that Plaintiff has not made a showing that he is likely to succeed on his claim that the two-arm administration of pentobarbital creates a significant risk that he will not be adequately anesthetized.

### b.      Use of Unregulated Drugs

Next, Plaintiff Michael asserts that the protocol requires the use of drugs, which are presently unavailable except in an unreliable form. (Doc. No. 141 at 10-11.) If contaminated, compromised, or substandard, Michael argues, the pentobarbital could cause severe pain upon administration, or could fail to have the intended anesthetic effect.

The allegations of this claim formed the subject matter of a discovery dispute and a motion for sanctions that Plaintiff Michael asks the Court to consider in ruling on the instant motion for preliminary injunction or stay of execution. Citing a state law that Defendants assert

required them to maintain the confidentiality of the drugs used in executions, Defendants withheld information relating to their sources of pentobarbital in direct violation of two orders of this Court. Only after the undersigned issued an order denying Defendants' motion to reconsider did Defendants supply Plaintiffs' counsel with discovery relating to the sources of the drugs on Saturday, November 3, 2012.

Defendants' disclosure revealed that their source of pentobarbital is a compounding pharmacy, and that the drugs were compounded for the DOC. (See Hrg. Nov. 5, 2012, Pl. Exh. 49 at 16.) Drug compounding is a process by which a pharmacy manufactures drug products pursuant to an individual prescription from raw ingredients. According to Dr. Waisel's testimony at the November 5, 2012 hearing, drug compounding is a lightly regulated industry, and is regulated differently in each state. Dr. Waisel testified that compounded drugs need not be reviewed by the United States Food and Drug Administration, and that the use of compounded drugs involves an increased risk that drugs will be impure or less potent than drugs subject to manufacturing standards, oversight, and testing. In further support of his argument, Plaintiff Michael submitted a peer-reviewed article outlining the essential differences between FDA-approved drugs and compounded drugs and recommending prescribers to prescribe FDA-approved drugs when available. (Hrg. Nov. 5, 2012, Pl. Exh. 51.)

At oral argument, Plaintiff Michael's counsel argued that due to Defendants' eleventh hour disclosure, Michael has not had the time to fully develop a claim that the use of compounded drugs creates an unconstitutional risk that he will suffer unconstitutionally severe pain. Thus, Plaintiff Michael, referencing his pending motion for sanctions, argued that the Court should sanction Defendants by barring them from contesting his claim that compounding

raises serious and substantial risks of pain in the execution.  In response, counsel for Defendants argued that Defendants' noncompliance with discovery orders was not in bad faith but was the result of demanding time constraints and a serious concern that the Court's order would require them to violate state law, not an insignificant event.  While the Court will write separately to address the pending motion for sanctions, the Court finds that Defendants' conduct does not warrant the requested sanction.  Thus, the Court will not bar Defendants from opposing Plaintiff Michael's claim related to compounded drugs.

While the Court recognizes Plaintiff Michael's concerns about the use of compounding drugs, his challenge related to the quality of the pentobarbital amounts to little more than an argument about the best practices in execution.  In fact, Defendants produced a laboratory report indicating that the pentobarbital that they intend to use in Mr. Michael's execution has a potency of 96.6%.  (Hrg. Nov. 5, 2012, Pl. Exh. 52.)  Plaintiff Michael argues that this report does not address the concerns that compounding raises, including what substances the compounding pharmacy or compounding manufacturer may have mixed with the drug.  Nonetheless, the Court is satisfied that the report casts significant doubt on Plaintiff Michael's argument that the compounded drugs may be less pure than FDA-regulated drugs.

Additionally, the Third Circuit evaluated a similar claim in Jackson II, 656 F.3d at 162-166.  In Jackson II, the plaintiffs moved for a stay of execution, arguing that Delaware's use of pentobarbital violated the Eighth Amendment because the drug was not approved by the FDA for use as an anesthetic.  Id. at 162.  The Third Circuit affirmed the United States District Court for the District of Delaware's denial of a stay of execution, noting that several other courts have held that the use of pentobarbital in lieu of sodium thiopental is constitutional.  Id. at 164-166.

The district court considered, <u>inter alia</u>, evidence that a 5,000 mg dose of pentobarbital would be lethal to a normal person, and considered Delaware's use of a consciousness check prior to administration of the second and third drugs. <u>See id.</u> at 163. Given the similarity of Pennsylvania's protocol – which calls for the use of 5,000 mg of pentobarbital, and calls for a consciousness check after administration of the pentobarbital – to Delaware's protocol with respect to the use of pentobarbital, coupled with the lack of evidence supporting Plaintiff's position, the Court declines to find that the use of unregulated pentobarbital creates a constitutionally unacceptable risk of harm. While use of an FDA-approved drug may be ideal, federal courts are not "boards of inquiry charged with determining 'best practices' for executions." <u>Baze</u>, 553 U.S. at 51.

Plaintiff Michael has not satisfied his burden of proving that the use of compounded drugs violates the Constitution; thus, the Court finds that he has not shown that he is likely to succeed on this claim.

### c. Safeguards Against Last-Minute Stay

Next, Plaintiff Michael argues that the execution protocol is unconstitutional because it does not provide a stabilization or rescue procedure in the event that a stay is issued after the execution has commenced. (Doc. No. 141 at 11-12.) Mr. Michael notes that the Kentucky protocol at issue in <u>Baze</u> set forth a procedure for resuscitation. Delaware's lethal injection protocol also sets forth a procedure for stabilization in the event that a last-minute stay of execution is ordered. (Doc. No. 108-12 at 10.)

While other states provide for a procedure to resuscitate inmates in the event that a last-minute stay of execution is ordered after drugs have been administered to the inmate, Plaintiff

Michael has provided no support for the proposition that such a procedure is required under the Eighth Amendment. The death penalty is, by definition, irreversible. Pennsylvania's lethal injection protocol contains safeguards to ensure that no stay of execution has been ordered prior to administration of the lethal injection drugs. Namely, the Pennsylvania lethal injection protocol requires the secretary of the DOC to ensure that no stay of execution has been ordered prior to giving the final order for the execution to proceed. (Doc. No. 108-4 at 13.) "There must come a time, even when so irreversible a penalty as that of death has been imposed upon a particular defendant, when the legal issues in the case have been sufficiently litigated and relitigated that the law must be allowed to run its course." Evans v. Bennett, 440 U.S. 1301, 1303 (1979). In Pennsylvania, the DOC has determined that the death penalty becomes irreversible after the Secretary of the DOC determines that no stay of execution has been ordered. The fact that other states provide a mechanism for resuscitation or stabilization of an inmate in the event that a stay of execution is ordered after the lethal drugs have been administered does not mean that all lethal injection protocols without such a procedure are unconstitutional.

Thus, the Court finds that Plaintiff Michael has not demonstrated a likelihood of success on his claim that the absence of a resuscitation procedure in Pennsylvania's lethal injection protocol violates the Constitution.

### d.      LIT Members' Training

Next, Plaintiff Michael sets forth three complaints about the LIT and the training of the LIT members. Specifically, Michael argues that members of the LIT are not adequately trained or qualified to assess consciousness, administer general anesthesia, or use the EEG monitor.

(Doc. No. 141 at 12-16.)  At oral argument, Plaintiff Michael also addressed an additional concern regarding the labels and color coding used on the lethal injection drugs.  These concerns all relate to whether the inmate is sufficiently anesthetized to avoid a "constitutionally unacceptable risk" of pain.  Baze, 553 U.S. at 53.  In Baze, Chief Justice Roberts explained that "failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."  Id.  As in Baze, Plaintiff Michael's Eighth Amendment claim "hinges on the improper administration of the first drug," which is pentobarbital in this case.  Id.

### i.      Assessing Consciousness

Plaintiff Michael's first complaint with respect to the LIT members' training is that the LIT members do not adequately understand the need for unconsciousness, and that they are not adequately trained to assess consciousness.  The first part of Mr. Michael's argument is unpersuasive; it is not necessary that the LIT members understand the importance of unconsciousness in the procedure.  The LIT members are not given discretion as to when to carry out the different steps of the lethal injection protocol.  Instead, the protocol details each step of the lethal injection process, and directs the LIT members when to move on to the next step.  The protocol requires the LIT to inject the inmate with an anesthetic, either 5,000 mg of pentobarbital or 3,000 mg of sodium thiopental, prior to injecting the second and third drugs.  (Hrg. Nov. 5, 2012, Pl. Exh. 14 at 30.)  The protocol also requires the LIT to ensure unconsciousness through a tactile stimulation and, if available, the use of an EEG monitor.  (Id. at 30-31.)  Regardless of whether the LIT members themselves understand the importance of

ensuring unconsciousness, the lethal injection protocol sets forth discrete steps to ensure that an inmate is unconscious prior to administration of the second and third drugs.

The proper inquiry is whether the LIT members are able to adequately carry out the procedures required by the lethal injection protocol, and whether the procedures themselves are sufficient. Plaintiff Michael's complaints do not relate to the qualifications and training required by the protocol, which requires that all LIT members be trained health care professionals who have completed intravenous therapy training and are experienced in performing venipuncture. (See id. at 9.) Rather, Plaintiff Michael argues that the LIT members do not fully understand the need for inmates to be unconscious prior to injection of the second and third drugs. However, deposition testimony of the LIT members indicates that they do, in fact, understand the importance of ensuring consciousness through the use of both an EEG machine and a tactile consciousness check.

LIT member A testified that the LIT members all received training on how to use an EEG monitor and practiced using the monitor in training sessions. (Hrg. Nov. 5, 2012, Pl. Exh. 7 at 17-18.) LIT member A also testified that the patient state index must be 9 or below for the inmate to be sufficiently anesthetized. (Id. at 20-21.) Member A further testified about the procedure for ensuring consciousness, explaining that the tactile consciousness check is a safeguard that is used in addition to the EEG monitor to ensure that the inmate is unconscious. (Id. at 62.) Similarly, LIT members B and C testified about the training that they received related to the use of an EEG machine and their understanding of the consciousness check. (Hrg. Nov. 5, 2012, Pl. Exh. 8 at 26, 42-45; Hrg. Nov. 5, 2012, Pl. Exh. 9 at 18-23, 39-41.) Upon reviewing the testimony of the LIT members and other evidence of record, the Court finds that

Plaintiff Michael has not proven a likelihood of success on the merits with respect to his claim that the LIT members are inadequately trained because they do not understand the importance of ensuring consciousness.

Plaintiff Michael also asserts that the consciousness check described in the protocol is inadequate to ensure unconsciousness, arguing that the tactile stimulations required by the consciousness check are ineffective because the LIT members are not trained or qualified to assess the inmate's reactions to the stimulations. According to Pennsylvania's lethal injection protocol, after the LIT members inject the inmate with an anesthetic and flush the IV lines with a saline solution, the LIT must ensure that the inmate is unconscious prior to moving on to the next steps. If an EEG monitor is being used, the LIT will observe the EEG monitor to determine if the PSI is nine or less prior to moving on to a tactile consciousness check. If an EEG monitor is not being used, the LIT will wait two minutes before moving on to the consciousness check. Next, the Capital Facility Manager or designee will call the inmate's name in a loud voice and observe the inmate for a reaction, a member of the LIT will assess the inmate by touching the inmate, shaking the inmate's shoulder, and brushing the inmate's eyelashes. The Capital Facility Manager or designee and the LIT will closely monitor the inmate and must agree that the inmate is unconscious.

The use of such a procedure was endorsed by Justices Ginsburg and Souter in Justice Ginsburg's dissent in Baze, 553 U.S. at 118 (Ginsburg, J., dissenting). Justice Ginsburg noted that Kentucky's protocol did not require anyone to call the inmate's name, shake the inmate, brush his eyelashes, or apply noxious stimulus to gauge his response. Id. Justice Ginsburg, citing a number of states that implement similar safeguards, further explained that such a

consciousness check could be easily implemented and could reduce the risk of dreadful pain.  Id. at 119.  The plurality in Baze rejected the necessity of a systematic mechanism for monitoring the anesthetic depth of the prisoner.  Id. at 58-59 (Roberts, C.J.).  Chief Justice Roberts explained that a proper dose of the anesthetic obviates the concern that a prisoner will not be sufficiently sedated, explaining that the "risks of failing to adopt additional monitoring procedures are . . . even more 'remote' and attenuated than the risks posed by the alleged inadequacies of Kentucky's procedures designed to ensure the delivery of" the anesthetic, which was thiopental in that case.  Id. at 59.  However, the plurality opinion also recognized that such tests may be effective in determining whether the anesthetic has entered into the inmate's bloodstream.  Id. at 60.  The performance of the consciousness check is, thus, an additional safeguard that is not constitutionally required.

Delaware's lethal injection protocol, which involves the use of a 5,000 mg dose of pentobarbital as an anesthetic, implements a consciousness check similar to the one described in Pennsylvania's protocol.  The district court reviewing Delaware's lethal injection protocol relied upon, inter alia, the use of this procedure in finding that the plaintiffs had failed to meet their burden of showing that the administration of pentobarbital creates a demonstrated risk of severe pain.  Jackson v. Danberg, Civ. No. 06-300-SLR, 2011 WL 3205453, at *3 (D. Del. July 27, 2011).  The Third Circuit affirmed the district court's denial of a stay of execution in that case.  Jackson II, 656 F.3d at 163-66.  Other courts have noted the importance of a consciousness check in reducing the risk of unconstitutional pain in a three-drug protocol involving pentobarbital.  E.g., Pavatt, 627 F.3d at 1340; DeYoung v. Owens, 646 F.3d 1319, 1327 (11th Cir. 2011).

Pennsylvania's lethal injection protocol involves a dose of pentobarbital that other courts have found to be more than sufficient to ensure unconsciousness. Further, Pennsylvania's lethal injection protocol requires members of the LIT to be trained health care professionals who have completed intravenous therapy training and to be experienced in performing venipuncture. This training in establishing IV lines significantly reduces any risk that the inmate with be insufficiently anesthetized. The use of a consciousness check is an additional safeguard to reduce the risk that an inmate will not be properly anesthetized. Deposition testimony of the three LIT members, moreover, confirms that they have been trained in using an EEG machine, and understand the necessary procedures for ensuring consciousness. Plaintiff Michael presented no evidence to support a finding that the LIT members are inadequately trained to assess unconsciousness.

Thus, the Court cannot find that Plaintiff Michael has proved that he is likely to succeed on the merits of his claim relating to the consciousness check.

### ii. Administering General Anesthesia

Next, Plaintiff Michael argues that the LIT members are insufficiently trained or qualified to administer general anesthesia. (Doc. No. 141 at 15.) In support of his argument, Mr. Michael asserts that registered nurses may only administer general anesthesia if they are certified to do so and are acting under the supervision of a physician. Pennsylvania's lethal injection protocol does not require LIT members to be registered nurses, and Plaintiff Michael asserts that none of the LIT members are certified as registered nurses. Plaintiff Michael also asserts that none of the LIT members are experienced in administering general anesthesia.

The Court need not determine whether the LIT members are <u>authorized</u> by state law to

administer general anesthesia in a normal clinical setting in order to rule on Plaintiff Michael's Eighth Amendment claim. Pennsylvania law requires the death penalty to be inflicted in certain circumstances by injection of lethal drugs. 61 Pa.. Cons. Stat. § 4304. It is thus necessary that someone be assigned the task of injecting the lethal drugs; "the power of a State to pass laws means little if the State cannot enforce them." McCleskey v. Zant, 499 U.S. 467, 491 (1991). Plaintiff Michael's claim related to the LIT members' training in administering general anesthesia was brought pursuant to the Eighth and Fourteenth Amendments' prohibition of cruel and unusual punishment. Thus, inquiry into the propriety of the LIT members' actions under state law is not essential to the Court's analysis of this claim.

However, whether the LIT members are sufficiently experienced to administer anesthesia is relevant to the Court's inquiry into whether the lethal injection protocol passes constitutional muster. Pennsylvania's lethal injection protocol requires its members to be trained health care professionals who have completed intravenous therapy training and to be experienced in performing venipuncture. (Doc. No. 108-3 at 1.) The Court in Baze noted that Kentucky used a phlebotomist and an EMT, "personnel who have daily experience establishing IV catheters for inmates in Kentucky's prison population." 553 U.S. at 55. The IV team in Kentucky also conducted at least 10 practice sessions per year, involving siting IV catheters into volunteers. Id. The Supreme Court noted that "[t]he qualifications of the IV team . . . substantially reduce the risk of IV infiltration." Id. at 55-56. Thus, the Supreme Court placed great import on the IV team members' ability to establish IVs, rather than their experience administering anesthesia specifically.

Here, Plaintiff Michael has produced no evidence that the LIT members are insufficiently

qualified to establish IV lines. The lethal injection protocol requires that the members be experienced in doing so. In fact, LIT member A testified that she starts IVs every day as part of her job (Hrg. Nov. 5, 2012, Pl. Exh. 1 at 3), LIT member B testified that she inserts IVs into patients "about a hundred [times] a day" (Hrg. Nov. 5, 2012, Pl. Exh. 2 at 3), and LIT member C testified that she also inserts "about a hundred IVs a day" (Hrg. Nov. 5, 2012, Pl. Exh. 3 at 4). As the Court explained above, the lethal injection protocol leaves very little discretion to the LIT members throughout the lethal injection process. The LIT members are not required to make decisions regarding how much of a particular drug to give an inmate, or when to do so. With respect to administering anesthesia, the lethal injection protocol simply requires the LIT members to establish an IV line, ensure that no stay of execution has been ordered, and administer a predetermined amount of sodium thiopental or pentobarbital from color-coded and labeled syringes. No evidence on the record would support a finding that the LIT members are insufficiently trained to carry out these tasks.

Thus, the Court finds that Plaintiff Michael has not satisfied his burden of proving that he is likely to succeed on his claim that the LIT members' training and qualifications regarding the administration of general anesthesia creates an unconstitutional risk of pain.

### iii.     Use of an EEG Monitor

Next, Plaintiff Michael argues that the LIT members are insufficiently trained or qualified to interpret an EEG machine. (Doc. No. 141 at 15-16.) He asserts that the LIT conducts a consciousness check only after the EEG monitor displays a PSI of nine or less, and that the this threshold reliance on the EEG to determine whether the inmate has reached a safe level of anesthesia before administration of the second and third drugs creates a substantial risk

of serious harm.  Plaintiff's expert, Dr. Waisel, offered his opinion that the inexperience of the LIT members limits the monitor's usefulness and may falsely reassure the LIT.  (Hrg. Nov. 5, 2012, Pl. Exh. 32 at 4.)  Specifically, Dr. Waisel noted that the LIT members only received practice using the EEG monitor on a fully conscious person.  (Id.)  As with many of Plaintiff Michael's other claims, these arguments amount to little more than an argument that more training would be helpful or would improve the reliability of the protocol.

As described above, the lethal injection protocol requires that a consciousness check be conducted either after two minutes have passed following administration of the anesthetic if an EEG monitor is not being used, or after the EEG monitor displays a PSI of nine or less, as indicated by displaying the colors purple or blue.  At their respective depositions, the LIT members described their training related to the use of an EEG machine, including placing the electrodes of the EEG monitor on a person, reading the monitor, and familiarizing themselves with the machine.  (See Hrg. Nov. 5, 2012, Pl. Exh. 7 at 17-18, 20-21, 25; Hrg. Nov. 5, 2012, Pl. Exh. 8 at 26; Hrg. Nov. 5, 2012, Pl. Exh. 9 at 18-23.)  The Court notes that the burden is on Plaintiff Michael to establish a likelihood of success, not on Defendants to prove that the LIT members are adequately trained.  Nothing in the LIT members' deposition testimony casts sufficient doubt on their training and qualifications with respect to using an EEG monitor to create a constitutional problem.  Further, nothing on the record suggests that any training beyond that described by the LIT members is necessary for the proper use of an EEG machine.  Moreover, the use of an EEG machine is an additional safeguard that will be used only if an EEG machine is available.  Regardless of whether an EEG machine is used or not, the LIT members will conduct a consciousness check.

Further, there appears to be no legal support for the proposition that the Constitution requires those carrying out executions to be specifically trained or qualified in the use of an EEG machine. Neither the Kentucky protocol, upheld by the Supreme Court in <u>Baze</u>, nor the Delaware protocol, upheld by the Third Circuit in <u>Jackson II</u>, required the use of an EEG machine; in fact, the use of such a machine was not discussed in either of those decisions. <u>Baze</u>, 553 U.S. 35; <u>Jackson II</u>, 656 F.3d 157.

Given the lack of legal or factual support for Plaintiff Michael's claim, the Court finds that he has failed to establish a likelihood of success on his claim that the LIT members' training and qualifications regarding the use of EEG machines creates an unconstitutional risk of pain.

### iv.      Color Coding and Labeling

At the November 5, 2012 hearing, Plaintiff Michael's counsel also elicited testimony and presented argument relating to the LIT members' training with respect to the colors and labeling of the drugs to be used during an execution. Neither Plaintiff Michael nor Defendants have submitted any briefing on this issue, but Dr. Waisel's expert report contains an opinion about the colors and labels on the lethal injection drugs. Dr. Waisel explained that the color coding used to label the drugs is inconsistent with the standard drug labeling in the field of anesthesiology. (Hrg. Nov. 5, 2012, Pl. Exh. 32 at 9.) Dr. Waisel opined that the LIT members may be confused due to this inconsistency. Plaintiff Michael has presented no evidentiary support for a finding that the labeling of the drugs creates a significant risk of harming him, beyond the speculation of Dr. Waisel. Dr. Waisel was accepted by the Court as an expert in the field of anesthesia, but he is not an expert in human factors, cognitive abilities, or any other field that would qualify him to offer an opinion on the adequacy of labels or of the LIT members' ability to interpret the drug

labels.

Absent any evidence supporting Plaintiff Michael's claim, the Court is satisfied that the

LIT members are sufficiently trained and qualified to read the labels on the lethal injection

drugs. Thus, Plaintiff Michael is not likely to succeed on a claim relating to the labeling of the

lethal injection drugs.

### e.     Time Limit to Achieve Venous Access

Next, Plaintiff Michael asserts that the lethal injection protocol's failure to place a time

limit on the LIT's efforts to achieve venous access creates an unconstitutional risk of pain. (Doc.

No. 141 at 16-17.) Indeed, as Plaintiff Michael notes, the execution protocol at issue in Baze

placed a one-hour limit for the lethal injection team to attempt to insert catheters in the prisoner.

While such a limitation is an additional safeguard that would reduce the risk of pain, the

Supreme Court in Baze explained that "an inmate cannot succeed on an Eighth Amendment

claim simply by showing one more step the State could take as a failsafe for other, independently

adequate measures." 553 U.S. at 60-61. The Pennsylvania lethal injection protocol requires

members of the LIT to be experienced in venipuncture. Plaintiff has presented no evidence that

there is a significant risk that it will take the LIT members an unreasonably long amount of time

to establish venous access. Moreover, even if there is a remote risk that it will take the LIT

members longer than an hour to establish an IV line, to be actionable under the Eighth

Amendment there must be an objectively intolerable risk, "not simply the possibility of pain."

Id. at 61-62.

Plaintiff Michael has not demonstrated a likelihood that he will succeed in proving an

objectively intolerable risk that he will suffer unconstitutional pain due to the lethal injection

protocols failure to require venous access to be achieved within one hour.

### f.    Deviations from Statute

Plaintiff Michael also asserts that the lethal injection protocol commands significant deviations from the statute that authorizes and delineates the manner of execution.  (Doc. No. 141 at 17.)  In support of his claim, Plaintiff Michael cites authority providing that significant deviations from an execution protocol can violate the Eighth Amendment.  See, e.g., Arthur v. Thomas, 674 F.3d 1257, 1263 (11th Cir. 2012).  However, while deviations from an execution protocol that protects inmates from cruel and unusual punishment can create an unconstitutional risk of pain, it does not necessarily follow that a protocol that deviates from a statute violates the Eighth Amendment.  The relevant inquiry is whether there is a substantial risk of severe pain. Plaintiff Michael has failed to establish that the protocol creates a substantial risk of severe pain in violation of the Eighth Amendment simply because it deviates from the statute that authorizes the death penalty in Pennsylvania.

Upon consideration of all of Plaintiff Michael's Eighth Amendment challenges to Pennsylvania's lethal injection protocol, the Court finds that he has not demonstrated a likelihood of success on the merits on this claim.  While Mr. Michael has noted some areas where the protocol may be strengthened, "federal courts are not boards of inquiry charged with determining best practices for execution."  Jackson II, 656 F.3d at 165 (quoting Baze, 553 U.S. at 51 (internal quotation marks omitted)).

### 2.    Remaining Claims

Plaintiff Michael also brought three claims that were not raised in the class complaint in this case: Claim II, a state law claim alleging that the protocol is invalid; Claim III, a due process

claim; and Claim IV, an access to counsel and the courts claim. Defendants do not respond to the merits of Plaintiff Michael's state law, due process, or access to counsel and the courts claims, instead arguing: (1) that Plaintiff Michael cannot introduce new claims into this case as an intervenor; (2) he has not satisfied the threshold exhaustion requirements for these claims; and (3) these state-law claims are not cognizable in this Section 1983 case. (Doc. No. 161 at 25-26.) The Court agrees that Plaintiff Michael may not introduce these new claims into this litigation as an intervenor.

### a.    Intervention

Rule 24(b) of the Federal Rules of Civil Procedure allows for "anyone" to permissively intervene, "[o]n timely motion" if "given a conditional right to intervene by a federal statute" or "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(A)-(B). Determining whether a motion for permissive intervention should be granted is within the discretion of the district court. See PA Prison Soc'y v. Cortes, 622 F.3d 215, 232 (3d Cir. 2010); Hoots v. Pennsylvania, 672 F.2d 1133, 1135 (3d Cir. 1982). "In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

For the reasons explained separately in the Court's order on Plaintiff Michael and Plaintiff Williams's pending motion to intervene, the Court finds that the motion is not timely, and that these additional claims do not satisfy the commonality requirement of Rule 24. First, although discovery was still ongoing at the time that the instant motion was filed, this action was instituted five years ago and the class was certified approximately two-and-a-half years ago. (Doc. Nos. 1, 61.) Plaintiff Michael, or the class of Plaintiffs, had ample opportunity to seek

leave to add claims to this action during the protracted history of this case. Moreover, the

warrant scheduling Mr. Michael's execution was issued on September 11, 2012, but the instant

motion was not filed until October 15, 2012, approximately three weeks before the date on which

Mr. Michael is scheduled to be executed. To require Defendants to address the newly raised and

legally complex claims included in the intervenor complaint literally at the eleventh hour would

unfairly distract them from their ability to litigate the underlying Eighth Amendment claims that

have defined this action since 2007 and would detract from the Court's orderly and timely

consideration of matters that have been pending for five years.

Further, although it is clear that the subject of Michael's new claims relate to the

administration of the death penalty – the same broad subject matter at issue in the underlying

litigation – the newly raised claims lack "common questions of law and fact" with the underlying

claims in this action. The original complaint in this case raises an Eighth Amendment challenge

to the lethal injection protocol based on an alleged risk of unnecessary pain and suffering. (Doc.

No. 1.) In the intervenor complaint, Mr. Williams and Mr. Michael attempt to raise three

additional distinct claims. First, they bring a state law claim relating to the statutory authority of

the DOC and the manner in which the lethal injection protocol was adopted under state

regulatory law governing notice and publication and agency authority to act by policy

statements. Additionally, Plaintiffs Michael and Williams frame a due process claim based on

these allegations, as well as a claim related to their right to access counsel and the courts. The

gravity of these claims is no substitute for commonality. Permissive intervention is permitted

only "when no additional issues are presented to the case, when the intervenor's claims are

virtually identical to class claims, and when intervention would strengthen the adequacy of class

representation." Eckert v. Equitable Life Assurance Soc'y of U.S., 227 F.R.D. 60, 64 (E.D.N.Y. 2005) (internal citations and quotation marks omitted).

The Court has assumed that these eleventh hour claims are advanced in good faith and that Plaintiffs Michael and Williams have not delayed their presentation for tactical advantage. Nevertheless, allowing Mr. Williams and Mr. Michael to intervene to litigate these additional claims would unfairly expand the scope of the litigation, risking undue delay in this matter where time is of the essence. Permitting the addition of these new claims would essentially allow Plaintiffs Michael and Williams to initiate an entirely new lawsuit, a result not intended by Rule 24(b). See Washington Elec. Co-op., Inc. v. Mass. Mun. Wholesale Elec. Co., 922 F.2d 92, 97 (2d Cir. 1990) ("[Rule 24(b)] is not intended to allow for the creation of whole new suits by intervenors."). Accordingly, the Court, in its discretion, will decline to allow Plaintiffs Michael and Williams to add these additional claims as intervenors, as this would substantially expand the scope of the main action and unduly complicate and confuse the underlying claims.

Thus, Plaintiff Michael is not likely to succeed on the merits of these claims. He has not demonstrated a "reasonable likelihood that [he] will ultimately win the relief [he] seek[s]," because the Court will not permit him to add these claims to this lawsuit. See N. Pa. Legal Servs., 513 F. Supp. at 681.

b.      Exhaustion of Federal Claims

Moreover, even if the Court were to allow Plaintiff Michael to add these additional claims, he is not likely to succeed on his additional federal claims because he has not exhausted his administrative rights with respect to the new federal claims. Pursuant to the exhaustion requirements of the Prison Litigation Reform Act (PLRA), 43 U.S.C. § 1997e(a), "[n]o action

shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Plaintiff Michael asserts that his due process and access to counsel and the courts claims do not relate to the conditions of his confinement, and that no meaningful administrative remedies exist for him to pursue his claims.

Both of these arguments have been rejected by the courts. First, the Third Circuit has held that there is no futility exception to the mandates of Section 1997e. Nyhuis v. Reno, 204 F.3d 65, 67, 78 (3d Cir. 2000) ("[T]he PLRA amended § 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory – whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action."). Second, the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). The Supreme Court has stated that the PLRA applies to Section 1983 claims challenging a prisoner's method of execution. Nelson v. Campbell, 541 U.S. 637, 650 (2004). The Supreme Court's decision in Nelson, along with its later decision in Hill v. McDonough, 547 U.S. 573, 579 (2006), instruct that challenges to the death penalty should be treated as either habeas corpus petitions, if they challenge the validity of the sentence, or as conditions of confinement suits, if they challenge only the method of the execution. As Plaintiff Michael's additional claims challenge only the method of his execution pursuant to the Pennsylvania lethal injection protocol, his claims must be treated as conditions of confinement claims, subject to the exhaustion requirements of Section 1997e. Because Plaintiff Michael does not dispute that he did not pursue administrative relief with respect to his due

process claim or access to counsel and the courts claim, he is not likely to succeed on the merits of these claims.

### c. Supplemental Jurisdiction

Regarding the additional state law claim, even if the Court permitted Plaintiff Michael to litigate this claim as an intervenor, the Court would decline to exercise supplemental jurisdiction over the claim. Federal district courts have original jurisdiction only over certain claims, including, inter alia, claims arising under the United States Constitution or federal law, and certain claims between parties from different states. See 28 U.S.C. §§ 1331, 1332. Additionally, district courts have supplemental jurisdiction over state law claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367. However, a district court "may decline to exercise supplemental jurisdiction over a claim" if:

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Because the Court finds that Claim II of Plaintiff Michael's motion and intervenor complaint raises novel or complex issues of state law, the Court would decline to exercise supplemental jurisdiction over the state law claim.

Plaintiff Michael's state law claim would require the Court to engage in a complex analysis of Pennsylvania's Prison Litigation Reform Act, 42 Pa. Cons. Stat. § 6602(e); Pennsylvania's administrative laws, including the Commonwealth Documents Law, 45 P.S. §§

1101 et seq., the Regulatory Review Act, 71 P.S. §§ 745.1 et seq., and the Commonwealth

Attorneys Act, 71 P.S. § 732-402(5); Pennsylvania's laws related to nurses' and paramedics'

legal authority, 49 Pa. Code. §§ 21.12(a), 21.17(1)-(4), 28 Pa. Code. § 1005.11(b)&(d); in

addition to Pennsylvania's lethal injection authorizing statute, 61 Pa. Cons. Stat. § 4304. Some

of the questions raised in the state law claim are issues of first impression, which the

Pennsylvania courts are in a better position to consider.

Thus, even if the Court permitted Plaintiff Michael to add this additional state law claim

to this action as an intervenor, the Court would decline to exercise supplemental jurisdiction over

the claim. Accordingly, Plaintiff Michael is not likely to succeed on the merits of his state law

claim in this Court.

**B.      Irreparable Injury**

Given Plaintiff Michael's failure to establish a likelihood of success on the merits, the

other preliminary injunction factors also do not weigh in favor of granting a stay. The validity of

Plaintiff Michael's death sentence has been litigated, and in some instances continues to be

litigated, in other forums. Those issues are not before the undersigned in this particular matter.

Given Plaintiff Michael's failure to establish a likelihood of success on the merits, he is not

likely to suffer the irreparable harm that would occur if he were executed in violation of the

Constitution and subjected to punishment that is "cruel and unusual." The Court finds the risk of

such harm to be remote. See Powell v. Thomas, 784 F. Supp. 2d 1270, 1283-84 (M.D. Ala.

2011) aff'd, 641 F.3d 1255 (11th Cir. 2011) cert. denied, 131 S. Ct. 2487 (2011) (finding that

plaintiff had not met his burden in proving irreparable harm where the risk of suffering

unconstitutional pain was not actual and imminent).

**C.      Harm to Non-Moving Party and Public Interest**

Finally, if a stay were granted absent a finding that Plaintiff Michael is likely to succeed on the merits of his claim, it would harm Defendants and would not be in the public interest. The Supreme Court has recognized that a state has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts." Hill, 547 U.S. at 384. Where Plaintiff Michael has not established a likelihood of success on the merits of his claim related to the lethal injection protocol, a stay of his execution would have practical harms to the DOC, which has taken significant steps to prepare for Plaintiff Michael's execution on the scheduled date, rather than a later date.

Moreover, it is not in the public interest to stay an execution absent a showing that Plaintiff Michael is likely to succeed on the merits of his constitutional challenge to Pennsylvania's method of execution. As Chief Justice Roberts explained in Baze:

> Reasonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable. But as Justice Frankfurter stressed in Resweber, "[o]ne must be on guard against finding in personal disapproval a reflection of more or less prevailing condemnation." 329 U.S., at 471, 67 S.Ct. 374 (concurring opinion). This Court has ruled that capital punishment is not prohibited under our Constitution, and that the States may enact laws specifying that sanction. "[T]he power of a State to pass laws means little if the State cannot enforce them." McCleskey v. Zant, 499 U.S. 467, 491, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

Baze, 553 U.S. at 61. Cognizant of these concerns, the Court recognizes that it is not in the interest of the public for a federal court to interfere with the Commonwealth's method of execution where capital punishment has been held to be constitutional and where Plaintiff Michael has not established a likelihood of success on the merits of his Eighth Amendment

claim. Moreover, the Court recognizes the "powerful and legitimate interest in punishing the guilty, an interest shared by the [Commonwealth] and the victims of crime alike." Calderon v. Thompson, 523 U.S. 538, 556, (1998). Thus, the potential harm to Defendants and the public interest weigh against a stay of execution in this case.

## V.  CONCLUSION

A federal district court can order a stay of execution where a state's execution would not comport with the Constitution. In order to grant such relief, the Court must find a likelihood of success on the merits and irreparable injury in the absence of a stay. The Supreme Court of the United States and the United States Court of Appeals for the Third Circuit have offered significant guidance on claims challenging methods of execution. In order to succeed on the merits of his Eighth Amendment claim, Plaintiff Michael would need to prove a substantial risk that he would suffer serious pain and needless suffering. Plaintiff Michael has failed to meet this burden. He has also failed to establish that he is likely to succeed on the additional claims that he attempted to bring into this litigation as an intervenor, mere weeks before his scheduled execution. Absent a finding that he is likely to succeed on the merits of his claims, the Court cannot grant the relief that Plaintiff Michael requests. Accordingly, the Court will deny his motion for preliminary injunction or stay of execution.

An order consistent with this memorandum follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FRANK ROBERT CHESTER, <u>et al.</u>,** | : | |
| **Plaintiffs** | : | |
| | : | **Civil No. 1:08-cv-1261** |
| **v.** | : | |
| | : | **(Chief Judge Kane)** |
| **JOHN E. WETZEL, <u>et al.</u>,** | : | |
| **Defendants** | : | |

<u>ORDER</u>

**ACCORDINGLY**, on this 6th day of November 2012, **IT IS HEREBY ORDERED**

**THAT** Plaintiff Hubert Michael's motion for stay of execution, temporary restraining order, or

preliminary injunction (Doc. No. 139) is **DENIED**.


<u>S/ Yvette Kane</u>
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania